2025 IL App (4th) 250540-U

NOS. 4-25-0540, 4-25-0541, 4-25-0542 cons.

<table>
<tr><td>

NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

</td><td>

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

</td><td>

FILED
October 20, 2025
Carla Bender
4th District Appellate
Court, IL

</td></tr>
</table>

| | |
|---|---|
| *In re* H.H., J.H., and R.H., Minors | ) Appeal from the |
| | ) Circuit Court of |
| (The People of the State of Illinois, | ) Carroll County |
|     Petitioner-Appellee, | ) Nos. 22JA3 |
|         v. | )     22JA4 |
| Angelica C., | )     22JA5 |
|     Respondent-Appellant). | ) |
| | ) Honorable |
| | ) John J. Kane, |
| | ) Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Lannerd and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, finding the trial court's termination of respondent mother's parental rights was not against the manifest weight of the evidence.

¶ 2    In August 2024, the State filed petitions to terminate the parental rights of respondent mother, Angelica C., to her minor children, H.H. (born in July 2019), J.H. (born in July 2018), and R.H. (born in June 2020). Following hearings on the State's petitions, the trial court found Angelica to be an unfit parent under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)) and determined it was in the minors' best interests to terminate her parental rights. We affirm.

¶ 3                I. BACKGROUND

¶ 4                                        A. Initial Proceedings

¶ 5           In November 2022, the State filed petitions for adjudication of wardship, alleging H.H., J.H., and R.H. were neglected minors whose environment was injurious to their welfare under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Act) (705 ILCS 405/2-3(1)(b) (West 2022)). The allegations regarding each child were the same. According to the petitions, the children lived with Angelica and her paramour, Jessey R., in a residence "infested with cockroaches and termites." The home had "a strong odor of feces and urine" and garbage strewn throughout. The children were "hungry often" and had no clean clothes. The trial court thereafter entered a temporary custody order and found there was an immediate and urgent need to remove the minors from the home and placed them in the temporary custody of the Illinois Department of Children and Family Services.

¶ 6           At the adjudicatory hearing, Lyndsey Coates, a Sinnissippi Centers service worker, testified she visited Angelica's home several times in November 2022. Angelica did not always allow Coates inside. Outside the home, Coates noticed "dirty diapers scattered across the entryway" and "a decent amount of trash and objects cluttering the front porch of the door." Inside, Coates saw "bags of trash" in the kitchen area and two of the children "asleep on a mattress in the living room." The home had a "strong odor" of "urine, feces, [and] trash." Coates also saw cockroaches "on the floor and walls," as well as evidence of a termite infestation. None of the children had clean clothes, and just two of them had appropriate winter garments. Nurses eventually examined the children at a hospital and provided them with "a pretty significant amount" of snacks and sandwiches. According to Coates, the children "were hoarding the food in the palms of their hands and were physically *** protecting the food from [her], the nurses[,] and their siblings." Coates testified J.H. also "approach[ed] the trash can and search[ed] through [it]

to see if there was any remaining food left," even though the children told her that they had already eaten.

¶ 7        Angelica testified she was currently unemployed. She testified "the garbage pickup wouldn't always pick up *** every week," and the trash seen outside her building came from an upstairs apartment. Angelica explained the odor in the home was due to the basement being "very moldy" and "filled with water[ and] dead rodents." She claimed she was unaware of the state of the basement until the electricity was shut off and she needed to access the power box. Angelica testified she fed the children three meals and one snack each day. She bathed them "every other two days." Angelica testified she had since moved out of the residence and was currently residing in a motel room. Thereafter, the trial court entered an adjudicatory order finding H.H., J.H., and R.H. neglected.

¶ 8                              B. Termination Proceedings

¶ 9        In August 2024, the State filed petitions to terminate Angelica's parental rights to H.H., J.H., and R.H. In relevant part, the petitions alleged Angelica was an unfit parent within the meaning of section 1(D) of the Adoption Act because she failed to make (1) reasonable efforts to correct the conditions that brought the minors into care and (2) reasonable progress toward the return of the minors within the following nine month periods: February 3, 2023 to November 3, 2023, and November 3, 2023 to August 3, 2024 (750 ILCS 50/1(D)(m)(i)-(ii) (West 2024)).

¶ 10                              1. *Unfitness Hearing*

¶ 11                              a. Christina Boyd

¶ 12        Christina Boyd, a child welfare specialist with Lutheran Social Services of Illinois, testified she was assigned to Angelica's case in November 2022. Boyd went over

Angelica's service goals related to mental health, parenting education, suitable housing, employment, domestic violence counseling, and cooperation. According to Boyd, Angelica failed to maintain safe and appropriate housing. From "case open to about June of 2023," Angelica resided in a motel room with Jessey. When Boyd visited Angelica's motel room, she observed piles of laundry and "trash laying around." The room also had an odor that Boyd could not describe. After the motel, Angelica moved into a one-bedroom trailer. Boyd visited that residence nine times, but Angelica did not always allow Boyd to evaluate it. When Boyd was allowed inside, she noticed "major holes in the flooring" and multiple animals in the home. She also observed "garbage piled up" and described the trailer as having an odor. Angelica then relocated to a one-bedroom apartment in May 2024 and stayed there until her eviction in August 2024. Boyd visited the apartment "three or four different times" and described it as minimally furnished and untidy; she believed "there were two dogs and at least one or two cats" present as well. The apartment had a smell that Boyd described "as a mixture of dirty laundry, animal, and *** body odor."

¶ 13          Boyd testified Angelica worked at Dairy Queen and Casey's General Store for "no more than two to three months." According to Boyd, Angelica indicated she worked as needed for a delivery service through Walmart, but Boyd stated Angelica had not provided proof of employment since January 2024. Angelica was also offered assistance in seeking full-time employment, but she declined.

¶ 14          Angelica's visitation with the children never became unsupervised. She also missed 11 visits with the children over the course of Boyd's assignment to her case. And even though Angelica interacted with the children appropriately during visits, "she struggled with discipline," so Boyd "referred her to parent coaching," which would have allowed someone to

- 4 -

provide real-time assistance and redirection. However, Angelica never set up those services. Eventually, Angelica's visitation time with the children was reduced after Angelica's repeated threats "to end early due to the children's behavior."

¶ 15                                    b. Sierra Inghram

¶ 16            Sierra Inghram, a behavioral health clinician with Sinissippi Centers, testified she took over Angelica's adult therapy and mental health services in December 2023. Inghram outlined Angelica's service goals related to developing healthy decision-making and coping skills. Inghram and Angelica never met in person, and Angelica was to participate in biweekly therapy sessions over the phone. Angelica was also required to participate in medication management appointments every three months. However, Angelica missed 9 of 13 therapy appointments between December 2023 and August 2024. She also missed several medication management appointments. Due to Angelica's infrequent attendance, Inghram did not believe Angelica made any progress related to her mental health treatment. Angelica ended all four of the therapy sessions she attended early, and according to Inghram, she appeared disinterested in "trying the skills offered" during those sessions. Inghram testified mental health services were discontinued after Angelica stopped communicating with her from June 2024 onward.

¶ 17                                    c. Angelica

¶ 18            Angelica testified on her own behalf. She felt as if she had completed everything asked of her. At the time of the unfitness hearing, Angelica resided in a motel room in Savanna, Illinois. Angelica described the room as having "two beds, a bathroom, a sink, [and] a microwave." She denied disallowing Boyd access to any place she lived. Although Angelica believed her current living arrangements were adequate for the children, she stated she "could still search and get into a different place." However, Angelica lacked the wherewithal to relocate.

- 5 -

¶ 19 Angelica received "food stamps" and relied on Jessey's Social Security benefits. Angelica denied being offered employment assistance. She stated she was actively seeking employment, and she worked "through Walmart, delivering groceries," when needed. However, Angelica acknowledged she had been without a vehicle "for the last five months" and had not made any deliveries since then. Angelica stated she participated in therapy sessions "over the phone" and accused Inghram of being untruthful about how many sessions she missed.

¶ 20 Angelica testified she tried to attend all her scheduled visitations with the children, but she admitted she "missed a few." As of July 2024, Angelica's visits with the children were once a month for one hour. Angelica could not recall being offered parenting coaching. According to Angelica, "discipline was not a problem for [her]." If one of the minors got upset or frustrated, Angelica claimed she would take them on a walk.

¶ 21                                  d. Unfitness Determination

¶ 22 In making its unfitness determination, the trial court observed Angelica never obtained stable or suitable housing for the children. She failed to be steadily employed. Due to her difficulties discipling the children during visits, Angelica was referred to parenting coaching, but she failed to engage in those services. The court noted Angelica's visitation time was reduced because she ended visits early. The court further pointed out Angelica failed to regularly participate in mental health therapy, noting she missed nine therapy sessions and four medication appointments. The sessions Angelica did attend were ended early by her. Eventually, mental health services were discontinued after Angelica stopped communicating with Inghram. Angelica also failed to complete her domestic violence counseling. Thus, the court found Angelica failed to make reasonable efforts to correct the conditions which were the basis for the removal of the minors and failed to make reasonable progress toward the return of the minors

within the relevant nine-month periods.

¶ 23                    2. *Best-Interests Hearing*

¶ 24          The matter then proceeded to the best-interests hearing. The best-interests report indicated H.H. and R.H. had been placed with their current foster family since November 2022. R.H. and H.H. were thriving in their current placement. They attended school regularly, performed well academically, and their foster family expressed interest in adoption.

¶ 25          The best-interest report indicated J.H. had "multiple placement disruptions due to on-going significant behaviors." J.H. was healthy but "developmentally behind in academics and some early childhood development." J.H. attended first grade and had an individualized education program "for extra help and support through the school days." He had difficulty regulating emotions, had "tantrums lasting on and off from five minutes to an hour," and could "become violent towards himself and others." J.H. attended biweekly counseling sessions and was scheduled to begin weekly sessions "to address past traumas, identifying emotions, and impulsivity." J.H. also met with an intensive placement stabilization worker weekly to work on following directions and mood stability.

¶ 26          At the best-interests hearing, Boyd testified J.H.'s current foster placement was his fifth, and he had resided there since May 2024. Boyd explained J.H. "experience[d] significant behaviors. When protective custody was taken, behaviors were lasting five to seven hours at a time of screaming, self-harming, possibly of hitting himself, hitting others, being very aggressive in impulse towards others and himself." J.H.'s current foster family was not an option for permanent placement because they did not feel they could support J.H. long-term due to their age. However, Boyd testified J.H. had begun transitional visits with another foster family that was interested in working with him. J.H.'s potential foster parent had an extensive background in

behavioral health, was "very educated on behaviors," and "work[ed] with autistic youth in the community."

¶ 27    Angelica testified she still resided in a motel room. Angelica had made no progress in finding employment. She received "food stamps monthly" and continued to rely on Jessey's Social Security benefits to pay their monthly rent. Ultimately, the trial court found it was in the best interests of H.H., J.H., and R.H. to terminate Angelica's parental rights.

¶ 28    This appeal followed.

¶ 29                                II. ANALYSIS

¶ 30    On appeal, Angelica contends the trial court's unfitness findings were against the manifest weight of the evidence. She further contends the court's determination regarding J.H.'s best interests stands against the manifest weight of the evidence.

¶ 31                            A. Unfitness Finding

¶ 32    " 'The State must prove parental unfitness by clear and convincing evidence.' " *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011) (quoting *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067 (2004)). A determination of parental unfitness involves factual findings and credibility determinations which the trial court is in the best position to make because its "opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21. "A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48. "A trial court's decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." (Internal quotation marks omitted.) *In re N.B.*, 2019 IL App (2d) 180797, ¶ 30.

¶ 33    The Adoption Act provides several grounds on which a trial court may find a

- 8 -

parent unfit. "[S]ufficient evidence of one statutory ground *** [is] enough to support a [court's] finding that someone [is] an unfit person." (Internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83. In the present case, the trial court found Angelica was an unfit parent as defined in sections 1(D)(m)(i) and (ii) of the Adoption Act (750 ILCS 50/1(D)(m)(i)-(ii) (West 2024)). Section 1(D)(m)(i) of the Adoption Act provides, in relevant part, that a parent is unfit for failing "to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(i) (West 2024). "Reasonable efforts relate to the goal of correcting the conditions that caused the removal of the child from the parent [citation], and are judged by a subjective standard based upon the amount of effort that is reasonable for a particular person." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1066-67 (2006). "The reviewing court must determine whether the parent has made 'earnest and conscientious' strides toward correcting the conditions that led to the removal of the minor." *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24.

¶ 34    Here, the trial court's determination Angelica was unfit for failing to make reasonable efforts to correct the conditions that brought H.H., J.H., and R.H. into care during any relevant nine-month period was not against the manifest weight of the evidence. The State's evidence demonstrated the children came into care because of their deplorable living conditions and mental health concerns involving Angelica. However, Angelica made essentially no effort to correct these concerns. She never obtained suitable, stable, or even safe housing for the children. As of the date of the unfitness hearing, Angelica resided in a single motel room consisting of "two beds, a bathroom, a sink, [and] a microwave." She failed to be steadily employed and relied almost entirely on her paramour's Social Security benefits. Angelica's visitation with the

children never became unsupervised. Due to her difficulties discipling the children during visits, Angelica was referred to parenting coaching, but she failed to engage in those services. Angelica's visitation with the children was finally reduced because she kept threatening to end visits early. Angelica failed to complete her domestic violence counseling and made no progress on her mental health treatment. Angelica was to participate in biweekly therapy sessions over the phone, but she failed to regularly attend, missing 9 of 13 sessions. Eventually, mental health services were discontinued after Angelica became unreachable.

¶ 35　　　　Thus, given Angelica's near-total lack of effort in correcting the conditions which led to the minors' removal, we cannot say the trial court's unfitness finding stands against the manifest weight of the evidence because the opposite finding (*i.e.*, fitness) is not readily apparent. See *N.B.*, 2019 IL App (2d) 180797, ¶ 30.

¶ 36　　　　　　　　　　　　B. Best-Interests Finding

¶ 37　　　　After a parent is found unfit, "the focus shifts to the child." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The issue ceases to be "whether parental rights can be terminated" and becomes "whether, in light of the child's needs, parental rights should be terminated." (Emphases omitted.) *D.T.*, 212 Ill. 2d at 364. The trial court must consider the factors set forth in section 1-3(4.05) of the Juvenile Act (705 ILCS 405/1-3(4.05) (West 2024)). See *In re T.A.*, 359 Ill. App. 3d 953, 959-60 (2005). Those factors include: the child's physical safety and welfare; the development of the child's identity; the child's familial, cultural, and religious background and ties; the child's sense of attachments, including where the child feels loved, attached, and valued; the child's sense of security, familiarity, and continuity of affection; the child's wishes and long-term goals; the child's community ties; the child's need for permanence; and the uniqueness of every family and each child. 705 ILCS 405/1-3(4.05) (West 2024). We will not overturn a

court's best-interests finding unless it is against the manifest weight of the evidence. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009).

¶ 38        Here, the evidence shows the best-interests factors support the termination of Angelica's parental rights. J.H. was currently in his fifth foster placement. He was healthy but "developmentally behind in academics and some early childhood development." He also experienced "significant behaviors." To help address these issues, J.H. had an individualized education program "for extra help and support through the school days." He also attended biweekly counseling sessions and was scheduled to begin weekly sessions "to address past traumas, identifying emotions, and impulsivity." J.H. also met with an intensive placement stabilization worker weekly to work on following directions and mood stability. And although his current foster placement could not offer him permanence, he was beginning transitional visits with another foster parent who had an extensive background in behavioral health. J.H.'s potential foster parent was also "very educated on behaviors" and "work[ed] with autistic youth in the community." Meanwhile, Angelica remained unable to offer J.H. any meaningful safety, security, or permanence. Angelica still resided in a motel room. She failed to make any progress in finding employment, and she continued to rely on Jessey's Social Security benefits to pay their monthly rent.

¶ 39        When weighed against a legitimate concern for permanency for children of tender years, the trial court's finding termination was in J.H.'s best interests is not against the manifest weight of the evidence. See *T.A.*, 359 Ill. App. 3d at 960. Thus, we cannot say the court erred in finding it was in J.H.'s best interests to terminate Angelica's parental rights.

¶ 40                                III. CONCLUSION

¶ 41        For the reasons stated, we affirm the trial court's judgment.

¶ 42          Affirmed.